# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 21-20254-CR-GAYLES/TORRES

UNITED STATES OF AMERICA,

      Plaintiff,

v.

TENARD TYRONE THOMAS,

      Defendant.

_____/

## REPORT AND RECOMMENDATION
## ON DEFENDANT'S MOTION TO SUPPRESS

This matter is before the Court on Tenard Tyrone Thomas' (the "Defendant")
motion to suppress evidence protected under the Fourth Amendment of the United
States Constitution.  [D.E. 23].  The United States of America (the "Government")
responded to Defendant's motion on September 14, 2021 [D.E. 29] to which the
Defendant replied on September 21, 2021.  [D.E. 30].  An evidentiary hearing was
held on September 22, 2021,[1] and both parties submitted supplemental briefs on
October 4, 2021.  [D.E. 40, 41].  Therefore, the motion is now ripe for disposition.[2]
After careful consideration of the motion, the response, the reply, the testimony of

---

[1]    At the hearing, Miami-Dade Police Officers Gabriella Guerra, Jaime Richter,
and Frank Elias testified.   Video footage from cameras worn by Officers Guerra and
Elias and certain 911 calls were played.

[2]    On September 7, 2021, the Honorable Darrin P. Gayles referred the motion to
the undersigned Magistrate for disposition.   [D.E. 27].

the witnesses and the exhibits admitted at the hearing, the oral arguments of counsel, and the supplemental briefs, the Court recommends that the Defendant's motion be **DENIED** for the reasons set forth below.

## I.    FINDINGS OF FACT

On January 17, 2021, at approximately 9:30 p.m., a woman named Brianna called 911 to report that her ex-boyfriend was attempting to break into her home. Briana described the suspect as a black man wearing black pants and a grey and blue jacket, that he was traveling on foot, and unarmed.   She also reported that she had a restraining order against the suspect.   Briana, who made several calls to 911 that evening and was unclear at times, told the 911 operator that she lived at 7160 NW 14th place, Miami, FL.   The official dispatcher report, however, stated that the attempted burglary was occurring at 7150 NW 14th place.   7150 NW 14th place is not a recognized address.   Officers from Miami-Dade Police Department's priority response team testified that they recalled reporting to the address that was provided to them verbally by the dispatcher.

Once on the scene, the officers testified that they canvassed the general area looking for Briana, the suspect, or any evidence of the attempted burglary.   The officers knew this neighborhood to be a high-crime residential area.   Based on their training and experience, the officers believed that a burglary suspect in a high-crime area that had a restraining order against him may have a weapon on his person. After a few minutes of not finding the suspect or the 911 caller, the officers continued

the search at 1441 NW 71st street.   This is a well-lit, gated, 12-building apartment complex that covers an entire street block.   The northwest part on the apartment complex is directly across the street from 7160 NW 14th place.   Below is a Google Map image of 7160 NW 14th place and 1441 NW 71st street:



Officer Gabriella Guerra saw the Defendant walking in the complex and noticed that he was a black male wearing black pants.   He was also wearing a black jacket with white stripes and a grey hoodie underneath with the grey hood visible. Officer Guerra testified that, based on her training and experience, she believed that

the Defendant materially matched the description of the suspect as she thought the 911 caller might have meant a dark blue color when describing the jacket.

After the Defendant saw the officers, Officer Guerra testified that she believed he acted suspicious because he abruptly changed the direction he was walking and went up a staircase.   From the footage of police worn body cameras, the building the Defendant entered was on the southwest corner of the complex.[3]   To investigate further, Officer Guerra and at least four other officers followed the Defendant as he went up the staircase.   Officer Guerra first asked the Defendant whether he lived there, and he responded that he did.   Once on the second floor, the Defendant kept walking, with at least three officers walking close behind him and at least two officers walking towards him from the other direction.   There was no other direction for him to go.   The Defendant then stopped at unit 205 and started to knock.[4]   The officers, while shinning flashlights into his face, asked the Defendant who lived in the apartment.   The Defendant first answered that it was "his peoples' house."   Then the officers said, "it is your peoples' house[?] You mean your girlfriend who doesn't

---

[3]     The Defendant appears to be at either the building numbered 7101 or 1441 on the Google Map image provided.

[4]     This is around the time that the body cameras worn by Officers Guerra and Elias started to record video.   The audio started to record approximately thirty seconds later due to an intentional delay built into the recording system.   Officer Richter testified that he did not use his body camera because the batteries were dead. Per policy, all the officers should have turned on their body worn cameras as soon as they exited their police cars as they were responding to an active attempted burglary.

want you to be here?"   The Defendant, looking confused, responded that his "auntie" lived in the apartment and that his girlfriend did not live there.

After no one answered the door, the officers asked the Defendant for his identification.   The Defendant explained that his brother had his phone and driver's license and that he was at a store.   A few seconds later, the Defendant spotted the person he claimed to be the brother biking on the street just outside the apartment complex, and the Defendant yelled out to him.   Officer Guerra then said "let's go" as at least five officers followed the Defendant while he walked towards the brother. While walking towards the brother, the Defendant asked for his phone and driver's license, but the brother said that their auntie had it.   Once outside the apartment complex's gate and on the sidewalk, the Defendant started to walk a little faster and past the brother, so Officer Frank Elias grabbed the back of the Defendant's jacket and walked him back to the group of officers including Officer Jaime Richter.

Officer Richter then asked the Defendant if he had any weapons on him.   The Defendant responded that his cell phone charger was on him and moved his hands towards his waist band.   At the same time, and a few feet behind Officer Richter, the brother was acting agitated as the rest of the officers questioned him.   The brother was also a black man wearing black pants, a grey hoodie, and a dark colored jacket. Officer Richter—who testified that he believed the Defendant might be carrying a weapon because he was a burglary suspect, had a protective order against him, was in a high crime area, was acting strange along with the brother, and was reaching down

towards his waist band—put his hands on the Defendant's hands as the Defendant reached for his waistband.   Officer Richter felt what we believed to be a firearm from the outside of the Defendant's clothes.   Almost simultaneously, the brother sprinted across the street from the officers while an oncoming car almost hit him and continued to run behind a house.   All the officers except Officer Richter and Officer Elias immediately started to chase the brother by foot.

While the officers started their pursuit of the brother, Officer Richter announced that the Defendant had a gun.   Officer Elias then told the Defendant to sit down and then also ran after the brother.   Officer Elias testified that he ran after the brother because he felt that he may come back to harm them.   However, this left Officer Richter alone with the Defendant.   During this time, Officer Richter frisked the Defendant, redirected the Defendant to the ground, and removed a firearm from the Defendant's person.   During a full search shortly afterwards, a second firearm fell out of the Defendant's jacket.   Both firearms were loaded with ammunition.

The officers never found the brother and later learned that the Defendant was not the attempted burglary suspect.   Law enforcement knew this as they saw Briana after the Defendant was arrested and said the suspect was standing next to her before he ran off.   The Defendant was charged with being a felon in possession of a firearm and ammunition in violation of Title 18, United States Code, Section 922(g)(1).   The Defendant moves to suppress the two firearms and their ammunition as they were

the fruit of an illegal search under the Fourth Amendment of the United States Constitution.

## II.    *ANALYSIS*

The Defendant moves to suppress physical evidence and statements because he argues that the officers' (1) initial seizure of him and (2) subsequent search of his person was each unlawful.   The Defendant first argues the officers lacked reasonable suspicion that he was the suspect because he was wearing a black jacket with white stripes, was down the block and around the corner from the reported attempted burglary, and cooperated with police.   As a result, the Defendant asserts that it was unlawful when the officers detained him outside of unit 205.   If we find that the officers lacked reasonable suspicion that he was the suspect, and assuming the Defendant was seized outside of unit 205, then any subsequent search of the Defendant was unlawful, and our inquiry ends.   *See United States v. Heard*, 725 F. App'x 743, 754 (11th Cir. 2018) ("Because we conclude that articulable reasonable suspicion did not exist at the inception of the *Terry* stop, the stop violated the Fourth Amendment, and we need not analyze whether the scope of the stop or search was reasonable.").   We thus first determine whether the officers had reasonable suspicion that the Defendant was the suspect when they first approached him.

### A.    <u>*There was Reasonable Suspicion that the Defendant was the Suspect*</u>

"The Fourth Amendment protects individuals from unreasonable search and seizure."   *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001).   There are

7

"three broad categories of police-citizen encounters for purposes of our Fourth Amendment analysis: (1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests." *United States v. Perez,* 443 F.3d 772, 777 (11th Cir. 2006). "[T]he first category of consensual encounters does not implicate [F]ourth [A]mendment scrutiny." *Id.* (quoting *United States v. Espinosa–Guerra,* 805 F.2d 1502, 1506 (11th Cir. 1986)) (second and third alterations in original). But the second category requires that an officer have "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot[.]'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

We "view the totality of the circumstances in the light of the officer's special training and experience because 'behavior, seemingly innocuous to the ordinary citizen, may appear suspect to one familiar with [criminal] practices.'" *United States v. Matchett*, 802 F.3d 1185, 1192 (11th Cir. 2015) (quoting U*nited States v. Smith,* 201 F.3d 1317, 1323 (11th Cir. 2000)) (internal quotations omitted). Particular "[c]ircumstances that we consider include the time of day, the location of the scene, the lighting at the scene, the number of officers, and the nature of the alleged crime." *United States v. Johnson*, 921 F.3d 991, 998 (11th Cir. 2019) (citing *United States v. Griffin*, 696 F.3d 1354, 1359-60 (11th Cir. 2012)). "While reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a

minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (internal quotation marks omitted). Moreover, "[i]t does not require officers to catch the suspect in a crime. Instead, [a] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity." *United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004) (citations omitted). This requires, however, "more than 'an inchoate and unparticularized suspicion or hunch.'" *Sokolow*, 490 U.S. at 7 (quoting *Terry*, 392 U.S. at 30).

The parties dispute whether the interaction outside unit 205 was consensual or a seizure. However, this inquiry is moot if the officers had reasonable suspicion to seize him at that point in time. We therefore review the totality of circumstances that existed at the time the officers first approached the Defendant.

The Defendant frames this case as police officers stopping a man just because he was black and walking around a high-crime area at night. He supports this assertion by the fact that he was down the block and around the corner from the attempted burglary and did not match the description of the suspect. This is an oversimplification of the facts and circumstances. We start with the description of the suspect.

The 911 caller, while someone was trying to break into her home, reported to police that the suspect was a black male wearing black pants and a blue and grey jacket. The caller did not report the shade of blue. There is no question that the Defendant was a black male wearing black pants and was wearing a dark colored

jacket.   And the grey from his grey hoodie looked to be part of the jacket.   The officers testified that the shade of blue could have been navy blue or another shade of dark blue, which might look like black at night.   The officers therefore believed the Defendant matched the description of the suspect.

The Defendant disagrees.   He notes that the apartment complex was well lit, so the officers could clearly see the jacket was black with white strips and not blue. But the Defendant's criticism of the officers' observation skills is not the appropriate inquiry.   What matters is that a reasonable officer would care about what the 911 caller might have seen as the suspect was trying to break into her apartment.   The officers did not and could not know if the area outside her apartment was well lit and whether the 911 caller got a clear look at the suspect.   The officers testified that sometimes 911 callers do not give entirely accurate descriptions of suspects.   It was therefore reasonable for the officers to believe, based on their experience, that the 911 caller may have mistaken a dark black jacket with white strips and a grey hood sticking out with a dark blue and grey jacket.   *See United States v. Scott*, 816 F. App'x 732, 737 (3d Cir. 2020) (finding a *Terry* stop constitutional even though the defendants "were not wearing all of the clothing described in the dispatch or depicted on the surveillance video . . .").   The Defendant also argues that the 911 caller might have meant a light blue color.   Even if true, the officers would have been equally reasonable to conclude that the Defendant matched the suspect's description if he was wearing black pants and a light blue jacket with grey.

10

In any event, the Defendant contends that a vague description of a suspect does not meet the Fourth Amendment's "demand for specificity." *Terry*, 392 U.S. at 21 n. 18. The Defendant primarily relies on the Third Circuit's opinion in *United States v. Brown* to make the argument that the description of the Defendant here was too vague to cut constitutional muster. 448 F.3d 239 (3d Cir. 2006). In *Brown*, the exact description the officers were given was in dispute. *See id.* at 241-42. But, the Third Circuit found that the description of two "African–American males between 15 and 20 years of age, wearing dark, hooded sweatshirts and running south on 22nd Street, where one male was 5'8″ and the other was 6'[]" too generic especially in light of the defendants being 28 and 31 with full beards and only wearing dark clothing. *Id.* at 247-48. The Third Circuit concluded that the officers lacked reasonable suspicion based on this generic description and the defendants not even matching it, that the defendants "were [not] in a high crime area. Neither were they on the street late at night. Nothing about their behavior was evasive or suspicious," and because the officers relied on a bad location tip that said the defendants were leaving a store with coffee three blocks away from the reported crime. *Id.* at 251.

Applying that analysis here on the assumption that the Eleventh Circuit would agree with that result, while the description provided here was relatively generic, the Defendant at least materially matched it. That is not what happened in *Brown*. Regardless, this analysis of the particulars of a description is just one factor to

11

consider in the totality of circumstances. When we consider other relevant factors, Defendant's position loses steam.

In particular, we must also consider the fact that the Defendant abruptly changed his walking direction when he saw the officers.  Officer Guerra credibly testified that, as she witnessed here, quickly changing directions after seeing police officers is suspicious behavior as it shows the individual may be trying to evade law enforcement.   In general, courts must credit an officer's "common sense conclusions about [a suspect's] behavior."  *United States v. Cortez*, 449 U.S. 411, 418 (1981); *see also Wardlow* 528 U.S. at 121-22 (finding reasonable suspicion when officers patrolling an area known for heavy narcotics trafficking for drug related activity observed someone standing next to a building holding an opaque bag and the individual "looked in the direction of the officers and fled.").   At the same time, "[w]e have consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."  *Florida v. Royer*, 460 U.S. 491, 497-98 (1983) (plurality opinion) ("The person approached . . . need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way.")  (citing *Terry*, 392 U.S. at 32-33).   The fact that the Defendant changed directions when he saw the officers in isolation does not per se establish reasonable suspicion, but it is a factor to consider in the total mix.

We last consider the location of the Defendant when he was spotted by Officer Guerra.   If dispatch provided the officers with the 911 caller's correct address and

the Defendant was found there, the officers would clearly have had enough reasonable suspicion to seize the Defendant to confirm if he was the suspect.   On the flip side, if the officers spotted the Defendant over ten blocks away from the reported address with no explanation of why they were so far from the reported crime, this would likely eviscerate the reasonableness of seizing the Defendant even if he reacted the way this Defendant did. So, the geographic proximity of where the Defendant was spotted in relation to the reported crime matters.   *See Heard*, 725 App'x at 754 ("Factors like known criminal activity in an area; time of day; *proximity, both temporal and geographic*, to reported suspicious activity; unusual nervousness; and refusal to cooperate can certainly contribute to reasonable suspicion.") (emphasis added); *United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002) (stating that an individual's proximity to illegal activity is relevant to the reasonable-suspicion analysis).

The Defendant argues that the officers stopped the Defendant at a different address than the one provided without explanation for why they were there; hence, this Defendant's location at the time cannot support "individualized suspicion" that the Defendant was the suspect.   It is true that the Government never established exactly where or how the officers first reported to where they did.[5]   And it is also

---

[5]     The Government argues to re-open the evidentiary hearing to clarify the record on where the officers reported to and why they were at the apartment complex across the street from the attempted burglary in its supplemental brief.   This is not necessary, however.   The officers already testified that they canvassed the general area, and the apartment complex was in the general area.

true that the Defendant was found at an address located almost a block and half away from the apartment where the 911 burglary call came from.

But the problem Defendant has is that the officers credibly testified that, upon their arrival to the address provided to them by dispatch, they promptly canvassed the area trying to locate the 911 caller or the burglar.   The officers also explained that they did not recall being given an exact unit or building number, so they did not have a precise location to go to.   Moreover, some of the buildings in the apartment complex the Defendant was found at were directly across the street from the attempted burglary.   Specifically, the north side of the building where unit 205 appears to be located at is almost a stone's throw away from the address provided by the 911 caller.   The officers also testified that they did not see any evidence of an attempted burglary, the 911 caller, or anyone who matched the description of the suspect for a few minutes before seeing the Defendant.   It is not out of the realm of reasonableness for police officers to canvass the area around an attempted burglary looking for a suspect and then end up directly across the street a few minutes later. This is especially true when the suspect is reported to be on foot.   *See United States v. Felix*, 715 F. App'x 958, 962 (11th Cir. 2017) ("Defendant was walking in the area and along the trajectory that Officer Ursitti anticipated the robbers would flee, based on his familiarity with the neighborhood and the information provided by the police dispatcher.").[6]

---

6       The Government suggests the officers went across the street because the 911

Moreover, while the officers were questioning the Defendant outside of unit 205, one of the officers asked "you mean your girlfriend who doesn't want you to be here?"  While our inquiry is based on objective facts, this recorded statement shows the officer subjectively believed the Defendant was the suspect and the officers may have been at the correct address of the attempted burglary.   That fact also supports the officers' testimony that they had reason to investigate further and engage with this Defendant.

Yet Defendant responds that this case is very similar to the facts in *Heard* in which the Eleventh Circuit found a *Terry* stop unconstitutional.   *Heard* does have a few similarities as here.   The defendant, Heard, was in a high crime area at night while walking inside a gated apartment complex.   He was also not immediately next to where the reported crime occurred as a 911 caller reported hearing gunshots coming from the woods behind some of the apartment buildings.   *See Heard*, 725 F.

---

caller never provided the exact apartment unit she lived in and the dispatcher gave the officers the wrong address.  However, other officers reported to the correct address earlier in the night when the 911 caller first started making calls. Regardless, the officers testified that they started canvassing the area only after seeing no evidence of the attempted burglary once arriving on the scene.   It is thus objectively reasonable for the officers to believe the suspect may have been right across the street even if they knew they were no longer at the correct address.  We also note that the Defendant emphasizes that the apartment complex was gated, suggesting the officers were even more unreasonable to be there as they had to go all the way down the block and around the corner to enter the complex.   However, the Defendant could have jumped the fence and there may have been side gates for the officers to enter.   In fact, the Defendant left through a gate for pedestrians when walking towards the brother.

15

App'x at 745.   And the defendant was the first person spotted by police while conducting their search for the suspect.

While there are similarities with our case, the facts in *Heard* include two very material and significant differences.   First, law enforcement in *Heard* had *no* description of the suspected shooter while the Defendant here materially matched the description of the suspected burglar.   The officers there were just reacting to the sound of a shooting in a high crime area, hardly a reason to detain and frisk the first person they see.   Second, after uniformed officers spotted Heard walking his small dog and approached him, Heard "remained calm, provided identification, and willingly answered questions about the gunshots, his residence, and his reason for being there."   *Id.* at 754.   In this case, the Defendant did not remain calm when he saw uniformed officers; he abruptly changed the direction he was walking and went up a staircase.   The individual's reaction in *Heard* undermined reasonable suspicion; our Defendant's reaction solidified it.   So we agree that *Heard* is a helpful example, but only because it highlights why the officers' decisionmaking here is on sound constitutional footing in contrast to the shaky ones at issue in *Heard*.

When we put all the totality of circumstances in context, we see (1) the officers responding to an attempted burglary without an exact address but armed with a description, (2) they begin canvassing the area and see that the Defendant was an individual that matched the description of the alleged burglar, (3) the Defendant was in a high crime area at night, (4) he was at an apartment complex located directly

across the street from exact location that first reported the burglary, and (5) he acted strangely and suspiciously when he first sees the uniformed officers. While a close call, these facts give rise to reasonable suspicion that the Defendant may have been the suspect the officers were looking for. Under *Terry,* the officers had constitutionally supported reason to investigate further even if it meant briefly stopping the Defendant to do so. The initial decision to stop the Defendant after he briskly changed direction was perfectly lawful. *See, e.g., Felix*, 715 F. App'x at 963 (affirming lower court that found that "[s]topping an individual who matches the description of an armed robber in relative close proximity to the crime scene, within ten minutes of the crime occurring, and patting them down for weapons is well within the bounds of the Fourth Amendment and *Terry*."); *Scott*, 816 F. App'x at 737 (finding a *Terry* stop constitutional even though the defendants "were not wearing all of the clothing described in the dispatch or depicted on the surveillance video, and their reaction to the police vehicle could be viewed as nonsuspicious avoidance of a car tailing two pedestrians at close range. Joel Scott, however, was wearing short sleeves in thirty-degree weather, and the pair was stopped within 125 yards of a bank that minutes earlier had been robbed by two men.").

Having established that the officers had reasonable suspicion to conduct a *Terry* stop as soon as they encountered the Defendant, there is no need to determine whether he was seized while he was standing outside unit 205. We must, however,

determine whether Officer Richter had reasonable suspicion to pat-down the Defendant for a weapon.

### B.    *Officer Richter's Search of the Defendant was Lawful*

"Once an officer has stopped an individual, he may conduct a pat-down or frisk for weapons if he reasonably believes that his safety, or the safety of others, is threatened." *Griffin,* 696 F.3d at 1359.   To frisk a suspect, an officer "conduct[s] a carefully limited search of the outer clothing of [the suspect] . . . to discover weapons which might be used to assault him." *See Terry*, 392 U.S. at 30.   And if an officer "feels a concealed object that he reasonably believes may be a weapon," he may continue the search beyond the outer clothing "by searching [the suspect's] pocket" and removing the concealed object.   *United States* v. *Clay*, 483 F.3d 739, 743-44 (11th Cir. 2007); *see also Johnson*, 921 F.3d at 997.   To determine if such a pat-down is lawful, our inquiry "is similar to our analysis of reasonable suspicion.   That is, we 'evaluat[e] the totality of the circumstances' instead of 'each fact in isolation.'" *Matchett*, 802 F.3d at 1192 (citing *Griffin*, 696 F.3d at 1359).

Here, we must determine whether the totality of the circumstances establish that Officer Richter was reasonable to believe that his safety was threatened when he frisked the Defendant.   In addition to all the factors that established reasonable suspicion to conduct the *Terry* stop, the Defendant said that his brother had his identification, but the brother denied having it and became agitated when he was asked for it.   The Defendant walked past the brother instead of stopping to talk to

him.   Moreover, after Officer Richter asked if the Defendant had any weapons, the Defendant reached for his waist band while the brother was still acting agitated behind him.   Officers Richter testified that his training and experience taught him that a furtive movement such as touching a waistband indicates that a person may possess a firearm.   A few seconds later, Officer Richter was left alone as all the other officers chased the brother across the street and he now felt something from the outside of the Defendant's clothes that felt like a firearm.

At this point, Officer Richter (1) knew he was in a high crime area at night, (2) the scene was unsecure and becoming chaotic, (2) he was alone, (3) he believed the Defendant was an attempted burglary suspect that had a restraining order against him, (4) the Defendant moved his hands towards his waist band, and (5) he felt a weapon in that area.   Based on Officer Richter's training and experience, his belief that his safety was threatened was reasonable.   He was thus entitled to conduct a limited search of the Defendant for any weapons.   *See Matchett*, 802 F.3d at 1192-93 (finding a pat-down lawful when an individual was suspected of burglary, was acting suspicious, and the officer was alone); *Johnson*, 921 F.3d at 998 (finding a *Terry* search lawful "[w]hen Officer Williams received the call about a burglary in progress at 4:00 a.m., he was patrolling a "high-crime area"   . . . Officer Williams saw Johnson, who matched the burglar's description, standing in a dark alley. And the scene was not yet secure.").

19

In sum, the officers had reasonable suspicion to conduct the initial *Terry* stop even though the Defendant was not at the exact address of the reported crime and did not perfectly match the description of the suspect.   The Defendant was a black male, wearing black pants, and wearing a dark colored jacket with grey.   This is materially the same as the description provided by the 911 caller.   He was also spotted in an apartment complex that was directly across the street from the reported address after the officers found no other suspects in the area.  He was in a high-crime area at night and acted suspiciously when he saw uniformed officers.   Then, in a hectic situation where the purported brother is running from the police across a busy street, the Defendant reaches towards his waistband after being asked if he is carrying a weapon.   When considering the totality of the circumstances, Officer Richter acted lawfully when he patted-down the Defendant for a weapon.   As it turned out, the Defendant was carrying two weapons.

Accordingly, Defendant's motion to suppress should be **DENIED**.

### III.      CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Defendant's motion to suppress be **DENIED**.

Pursuant to Local Magistrate Rule 4(b), the parties have until October 12, 2021, to file written objections, if any, with the District Judge.   The Court finds good cause to expedite the objection period as per Rule 4(b).   Any response to an objection is due by October 17, 2021.   Failure to timely file objections shall bar the parties

from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report.   *See* 28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Comm'r of Soc. Sec.,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 5th day of October, 2021.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge